**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Mar 15, 2023

IN RE:

**HARVEY BLAKE HADDOCK,**

**Case No. 22-10503-M**
**Chapter 7**

**Debtor.**

**MEMORANDUM OPINION**

---

"When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."
"The question is," said Alice, "whether you *can* make words mean so many different things."[1]

---

The law often concerns itself with the ordinary meaning of a word when it appears in a statutory or regulatory context.  Unlike Humpty Dumpty in Alice's Wonderland, the Oklahoma legislature is thought to say what it means, and mean what it says.[2]  Here we must tackle the legislature's word usage when a debtor takes liberties with the dictionary.  Before the Court is the Objection to Claims of Exemption (the "Objection"),[3] filed by Scott P. Kirtley, trustee herein ("Trustee"), and Debtor's Response.[4]  An evidentiary hearing was held on October 5, 2022, at which the Court received evidence and heard argument.  The following findings of fact and

---

[1] Lewis Carroll (Charles L. Dodgson), *Through the Looking-Glass* 103 (Dodge publishing company, 1909) Retrieved from the Library of Congress, https://www.loc.gov/item/09016128/.
[2] *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").
[3] Docket No. 24.
[4] Docket No. 26.

conclusions of law are made pursuant to Federal Rules of Bankruptcy Procedure 9014(c) and 7052

and Federal Rule of Civil Procedure 52.[5]

### Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b).[6]

Reference to the Court of this contested matter is proper pursuant to 28 U.S.C. § 157(a).

Allowance or disallowance of an exemption from property of the estate is a core proceeding as

contemplated by 28 U.S.C. § 157(b)(2)(B).

### Findings of Fact

Harvey Blake Haddock ("Haddock" or "Debtor") holds licenses as both a real estate agent

and broker in the state of California.  Haddock is the sole owner and shareholder of Haddock and

Associates Realty Group, Inc. ("HARG"), which is an S corporation incorporated in California in

August 2020.  HARG has operated as a luxury residential real estate brokerage in California since

its incorporation.  Haddock describes HARG as his employer, where he is an officer and its only

employee.[7]

From its inception until May 2022, Haddock never received a formal "paycheck" from

HARG.  Prior to January 2022, Haddock did not have a personal bank account, and conducted all

of his personal business through various corporate checking accounts, using primarily the HARG

business checking account (the "HARG Chase Account").  Prior to May 2022, Haddock regularly

transferred money directly from the HARG Chase Account, through ATM withdrawals of cash,

---

[5] Bankr. R. Fed. P. 9014(c) & 7052; Fed. R. Civ. P. 52.

[6] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

[7] This contradicts somewhat the information provided on Schedule I filed with his Petition, *at Docket No. 1*, at 33, where Haddock identified his employer generically as "Haddock and Associates" with an address in Jenks, Oklahoma.  Haddock testified that his Schedule I refers to HARG.

debit card transactions, bank transfers, purchases of personal property, etc., to pay his personal expenses.  At the end of each calendar year, Haddock would produce information to his accountant to separate business from personal expenses for tax purposes.  Haddock referred to these personal withdrawals and expenditures as "compensation for personal services" for his work as a broker and manager for HARG, which he felt was accounted for upon the payment of income taxes.

Both Haddock and his counsel emphasized that Haddock is the only employee of HARG. As such, Haddock testified that in order for HARG to generate income, it relies solely on his services.  When asked to describe the services he generally provides to HARG, Haddock listed: general management, marketing management, senior supervision management, and, almost as an afterthought, real estate sales.  Haddock was unable to say what his salary or compensation from HARG was for any time period, except that it varies from year to year.  As Haddock describes it, HARG generates income through sales commissions from successful closings of residential properties, and he is compensated based on the commission income earned by HARG.  Notably, Haddock did not indicate that he earned any commissions directly from his own labor as a real estate agent, only that he was owed compensation from HARG based its receipt of commissions as a brokerage.

When asked to describe the services he provided to HARG in the months of April and May of 2022, Haddock indicated that he managed its sales, marketing, website, and cash flow, as well as planning for the future, and interfacing with his CPA.  He indicated that he incurred "additional management time in May" beyond his normal duties, but provided no specifics.  In closing argument, counsel for Haddock doubled down on the characterization of Haddock as the sole generator of revenue for HARG: "The evidence is that everything that came out of the company [HARG], whether it's in a paycheck, or a draw, or came through the debit card, were compensation

to Mr. Haddock for the services he provided.  The only income source for the company was the services provided [by] Mr. Haddock.  There's no other way that that company [HARG] earned income."[8]  The discrepancy between Haddock's description of his brokerage and managerial job duties, on the one hand, and his depiction of himself as solely generating commissions for HARG, on the other, was never addressed.

For tax year 2020, Haddock reported to the I.R.S. that he earned no wages (from any source), including commissions, on his personal income tax forms.[9]  Nor did he report any distributions, income, or loss from HARG.[10]  In 2020, HARG reported to the I.R.S. that it paid no salaries or wages to any employee, nor any compensation to officers.[11]  Haddock testified that he did not receive, nor did HARG issue, a Form W-2 in 2020.  HARG reported ordinary business income of $6,449 in 2020, but did not report any distributions to shareholders.[12]

In tax year 2021, Haddock reported to the I.R.S. that he personally earned no wages (from any source), including commissions.[13]  Haddock reported $66,642 in passive income from HARG in 2021.[14]  In 2021, HARG reported to the I.R.S. that it paid no salaries or wages to any employee, nor any compensation to officers.[15]  Haddock testified that he did not receive, nor did HARG issue, a Form W-2 in 2021.  HARG reported ordinary business income of $66,642 in 2021, and reported distributions of $33,611 to Haddock.[16]

---

[8] Oral argument at 11:42, 10/05/2022, *In re Haddock*, (Oct. 5, 2022) (No. 22-10503).
[9] *See* Ex. 4, 2020 I.R.S. Form 1040 for Haddock, at 4-1, line 1.
[10] *Id*. at 4-3, Schedule 1, line 5; *id*. at 4-6, Schedule E, line 28.
[11] *See* Ex. 6, 2020 I.R.S. Form 1120-S for HARG, at 6-1, lines 7 & 8.
[12] *Id*. at 6-3, 6-4, Schedule K, lines 1 & 16d; *id*. at 6-5, Schedule M-2.
[13] Ex. 5, 2021 I.R.S. Form 1040 for Haddock, at 5-1, line 1.
[14] *See id*. at 5-3, Schedule 1, line 5; *id*. at 5-10, Schedule E, line 28.
[15] Ex. 7, 2021 I.R.S. Form 1120-S for HARG, at 7-1, lines 7 & 8.
[16] *Id*. at 7-3, Schedule K, line 1 & 16d; *id*. at 7-6, Schedule K-1, line 16.  No tax statements were available for the year 2022.

In January 2022, Haddock opened a personal bank account at First Bank of Owasso (the "Owasso Account").[17]  After a smattering of early activity, the Owasso Account was effectively dormant and empty prior to May 2022.  Prior to May 2022, no wages or other form of compensation from any source was deposited into the Owasso Account.

Haddock acknowledged that on or before February 21, 2022, when Haddock attended a hearing on assets in an unrelated litigation matter, he had retained bankruptcy counsel.  He also acknowledged that sometime prior to May 18, 2022, he had decided to file bankruptcy.  On May 18, 2022, Haddock executed an authorization for ADP, a tax filing service, to "process payroll" for HARG.[18]  ADP processed two checks from HARG to Haddock by direct deposit into the Owasso Account, and issued an "earnings statement" for each.[19]  The first check (the "April Check") was for $27,301.92, which purportedly covered the period April 1, 2022 to April 30, 2022, with a Pay Date of May 25, 2022.  The earnings statement for the April Check indicated Gross Pay of $42,000.00 and statutory deductions for state and federal employment taxes totaling $14,698.08.[20]  The second check (the "May Check") was for $28,353.92, which purportedly covered the period May 1, 2022, to May 27, 2022, with a Pay Date of May 27, 2022.  The earnings statement for the May Check indicated Gross Pay of $44,000.00 and statutory deductions for state and federal employment taxes totaling $15,646.08.[21]  Both earnings statements designated the basis of pay as "Salaried."  Together the April Check and May Check resulted in $86,000 being withdrawn from the HARG Chase Account during the last week of May 2022, and $55,655.84 (the

---

[17] Ex. 10, at 10-1.
[18] Ex. 2.
[19] *See* Ex. 3.
[20] *Id*. at 3-1.
[21] *Id.* at 3-2.

"ADP Funds") of that being deposited in the Owasso Account.  The ADP Funds remain in the Owasso Account and are the primary subject of the Trustee's objection.

When asked why he did not leave the ADP Funds in the HARG business account, Haddock indicated that "he was due compensation for services."  When asked how he decided the amount he was due, he indicated that it was based on "the size of the revenue that the company had earned." He testified that he purposely calculated the April and May Checks to bring the HARG Chase Account to a zero balance in the days immediately preceding his bankruptcy filing, and if more money had been in the account, he would have taken it, because, in his words, "I earned it!"

Haddock testified that contacted ADP in late May 2022 at the "urging" of his CPA. Haddock suggested that his CPA had an epiphany that the historical method of Haddock's receiving "compensation" from HARG, i.e., through direct draws from the company bank account, would not "suffice" for Haddock to vest any Social Security retirement benefits.  There was no suggestion that the CPA believed Haddock's role or duties at HARG had changed from previous months, or that he felt Haddock had been reporting his withdrawals from HARG incorrectly to the I.R.S. for tax purposes. The Court finds Haddock's testimony regarding his reasons for utilizing ADP's services on the eve of bankruptcy both incredible and fabricated.

On May 19, 2022, one day after Haddock executed the authorization to ADP, Thomas Downie, a creditor, filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code naming Haddock as the alleged debtor.[22]  Haddock then filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code (the "Voluntary Case")  on June 1, 2022 (the "Petition Date").[23] After the filing of the Voluntary Case, no party asked this Court to proceed under the involuntary

---

[22] *See* Case No. 22-10447-M
[23] Docket No. 1.

6

proceeding; instead, Mr. Downie asked the Court to dismiss that proceeding without objection.[24]

The Court granted Mr. Downie's motion and eventually closed the involuntary proceeding.  As a

result, the order for relief in the Voluntary Case became effective as of the Petition Date.

Haddock's schedules and Statement of Financial Affairs ("SOFA") filed in this case tell a

story that is more in line with his 2020 and 2021 tax returns than his testimony at the hearing.  On

Schedule I, Haddock described his occupation as "Real Estate Broker," and his employer as HARG

with an address in Jenks, Oklahoma, having been employed there for 1 year and 6 months.[25]

Haddock reported that he earns no "monthly gross wages, salary, and commissions."[26]  When

asked why he did not disclose his receipt of the ADP Funds or other so-called compensation here,

he stated: "Because on a monthly basis, there is no established salary.  There's zero.  It's based on

revenue from a company."[27]   Also on Schedule I, Haddock reported $2,163.16 in monthly "net

income from rental property and from operating a business, profession, or farm."[28]   At trial,

Haddock could not recall how he arrived at this number, or whether it included the ADP Funds

received less than one week prior to the Petition Date.  In his SOFA, Haddock disclosed that he

received income of $235,370 in 2020 from "operating a business."[29]   For 2021, he disclosed

income of $387,198 from "operating a business."[30] For 2022 up to the Petition Date, he disclosed

---

[24] *See* Case No. 22-10447, at Docket No. 13.  Courts have suggested that proceeding under the initial involuntary proceeding in such circumstances may avoid the type of diversion of assets as occurred here.  *See, e.g., In re Premier Gen. Holdings, Ltd.*, 427 B.R. 592 (Bankr. W.D. Tex. 2010).

[25] Docket No. 1, Schedule I, at 33, Q1. *See supra* note 7.

[26] *Id.*

[27] This, despite the clear direction on the form: "If not paid monthly, calculate what the monthly wage would be."  Docket No. 1, Schedule I, at 33, Q2.

[28] Docket No. 1, Schedule I, at 34, Q8a.  That question also instructed Haddock to "Attach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income."  No such statement was attached to the petition.

[29] Docket No. 1, SOFA, at 38-39, Q4.

[30] *Id.*

income of $301,311 from "operating a business."[31]  None of this income was indicated as being

"wages, commissions, bonuses, tips."[32]

To the extent the "Conclusions of Law" contain any misplaced findings of fact, those

findings are incorporated herein by this reference.

### Conclusions of Law

As of the Petition Date, Haddock reported having $1,826 cash on hand and the ADP Funds

of $55,655.84 being held in the Owasso Account, both of which he claims are exempt "wages or

earnings from services" under Oklahoma law.[33]  Haddock posits that he is properly classified as

an employee of HARG.  He contends that the cash on hand and ADP Funds are clearly and

unequivocally current wages or earnings for personal services earned in the 90 days before the

Petition Date, and therefore fall within the plain meaning of the relevant Oklahoma exemption

statutes.  Trustee disagrees, arguing that HARG has never treated Haddock as an employee and

the ADP Funds are not "earnings" or otherwise directly related to Haddock's personal services to

HARG, based primarily on the historical treatment of funds Haddock withdrew from HARG as

corporate distributions.  Trustee contends that Haddock's sudden efforts to classify HARG assets

as earnings or compensation on the eve of bankruptcy does not change their true nature as corporate

distributions tied to his ownership of HARG stock, which Haddock may not claim as exempt.

1.    *The Oklahoma Wage Exemption Statutes, § 1171.1 of title 12 and § 1(A)(18) of title 31 of the Oklahoma Statutes*

A debtor may exempt certain property from the bankruptcy estate pursuant to § 522(b)(1)

of the Bankruptcy Code.  In a chapter 7 bankruptcy case, all exemption entitlements are determined

---

[31] *Id.*

[32] *Id.*

[33] *Id.*, Schedule C, at 24 (claiming exemptions under Okla. Stat. tit. 12, § 1171.1, and tit. 31, § 1(A)(18)).

as of the date the case is filed.[34] Oklahoma has chosen to opt out of the federal exemption scheme,

limiting most exemptions available in bankruptcy cases to those provided under state law.[35]  The

issue before the Court is whether the cash on hand and the ADP Funds are exempt under Oklahoma

law.  The burden of proof is upon the Trustee to show by a preponderance of the evidence that the

exemption at issue was not properly claimed.[36]

In support of his claim of exemption, Haddock relies on § 1171.1 of title 12 of the

Oklahoma Statutes:

> A. Money that was **earned by a natural person as wages, salary, bonus or
> commission for personal services** shall be exempt from garnishment issued before
> judgment of the trial court except as provided for support in a divorce proceeding
> interlocutory order pursuant to this title, and as otherwise specifically provided by
> statute.
>
> B. Seventy-five percent (75%) of all **earnings for personal or professional
> services earned during the last ninety (90) days** shall be exempt from
> garnishment except for collection of child support obligations.[37]

In addition, Haddock relies on § 1(A)(18) of title 31 of the Oklahoma Statutes, which provides:

> A. Except as otherwise provided in this title and notwithstanding subsection B of
> this section, the following property shall be reserved to every person residing in the
> state, exempt from attachment or execution and every other species of forced sale
> for the payment of debts, except as herein provided:
>
>      . . .
>
> 18. Seventy-five percent (75%) of all **current wages or earnings for personal or
> professional services earned during the last ninety (90) days**, except as provided
> in Title 12 of the Oklahoma Statutes in garnishment proceedings for collection of
> child support[.][38]

---

[34] § 522(b)(3)(A); *In re Crow*, 987 F.3d 912, 921 (10th Cir. 2021) ("[A] debtor's right to an
exemption is determined on the petition date.") (citing *White v. Stump*, 266 U.S. 310, 313 (1924)).
[35] *See* § 522(b)(2); Okla. Stat. tit. 31, § 1(B); *In re Kretzinger*, 103 F.3d 943, 945 (10th Cir. 1996).
[36] *See* Fed. R. Bankr. P. 4003.  *See also In re Simpson*, 206 B.R. 230, 232 (Bankr. E.D. Okla.
1997).
[37] Okla. Stat. tit. 12, § 1171.1 (emphasis added).
[38] *Id*. tit. 31, § 1(A)(18) (emphasis added).

Together, the Court will refer to these as the "Oklahoma Wage Exemption Statutes."

We are now required to embark on a journey of statutory interpretation. "When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule."[39] "If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State."[40] In interpreting the Oklahoma Wage Exemption Statutes, the Court must "determine legislative intent through the 'plain and ordinary meaning' of the statutory language."[41] "Any doubt as to the purpose or intent of a statute may be resolved by resort to other statutes relating to the same subject matter."[42] The Court should "not limit consideration to one word or phrase," but "consider the various provisions of the relevant legislative scheme to ascertain and give effect to the legislative intent and the public policy underlying the intent."[43] "Generally, Oklahoma case law has construed and applied the exemptions in a reasonably limited matter [sic]."[44]

---

[39] *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002).

[40] *Id*. at 1119 (quoting *C.I.R. v. Bosch's Est.*, 387 U.S. 456, 465 (1967)).

[41] *In re Adams*, 2020 OK 80, ¶ 11, 474 P.3d 346, 350 (citing *In re Initiative Petition No. 397*, 2014 OK 23, ¶ 9, 326 P.3d 496, 501); *Johnson v. CSAA Gen. Ins. Co.*, 2020 OK 110, ¶ 19, 478 P.3d 422, 432, *as corrected* (Dec. 18, 2020) ("A primary goal when reviewing a statute is to ascertain legislative intent, if possible, from a reading of the statutory language and its plain and ordinary meaning.").

[42] *Am. Airlines, Inc. v. State, ex rel. Oklahoma Tax Commn.*, 2014 OK 95, ¶ 33, 341 P.3d 56, 65 (citing *Naylor v. Petuskey*, 1992 OK 88, ¶ 4, 834 P.2d 439, 440).

[43] *Id.* (citing *YDF, Inc. v. Schlumar, Inc.,* 2006 OK 32, ¶ 6, 136 P.3d 656, 658).

[44] *In re Adams*, 2020 OK 80 at ¶ 13, 474 P.3d at 350-35 (citing *In re McKaskle*, 117 B.R. 671, 674 (Bankr. N.D. Okla. 1990)). *See also Sec. Bldg. & Loan Ass'n of Okla. City v. Ward*, 1935 OK 996, 174 Okla. 238, 50 P.2d 651, 657 ("The purposes of the exemption statute are to prevent improvident debtors from becoming subjects of charity by preserving to them sufficient definitely classified property that they may maintain a home for themselves, and to prevent inconsiderate creditors from depriving them of the necessities of life. It is the duty of the court to so apply these exemption statutes as to accomplish these purposes.").

The rule is a simple one – look first to the statute.  If the statute tells the story, look no further.  The Court must address whether the cash on hand and the ADP Funds constitute current wages or earnings for personal services[45] earned during the last 90 days, within the purview of the Oklahoma Wage Exemption Statutes.  Oklahoma courts have treated the requirement that wages or earnings be "earned during the last 90 days" as a clarification of the word "current," and not as a separate requirement.[46]  The real dispute in this case lies in whether the cash on hand and ADP funds constitute wages or earnings for personal services paid by HARG to Haddock, or as the Trustee posits, they are more properly considered distributions based on Haddock's ownership of HARG.  The Court must, therefore, interpret what the Oklahoma state legislature intended to protect under the phrase "wages or earnings for personal services," and whether the ADP funds and cash on hand meet that definition.

As Haddock suggests, Oklahoma courts have found statutory references to "wages or earnings for personal services" to be clear and unambiguous, in the sense that they have not reached for dictionaries or legislative history to assist in their interpretation of these terms.[47]  But those courts have not read the terms as Haddock does.  In *Barteldes Seed Co. v. Gunn*, the Oklahoma Supreme Court addressed these terms under previous iterations of two related wage exemption statutes.[48]  That court drew a distinction between "wages" and "earnings for personal

---

[45] Haddock has not alleged that he provided any professional services to HARG. Instead, in his testimony, Haddock relied exclusively on the phrase "earnings for personal services."  The Court will follow suit.

[46] *Oil Well Supply Co. v. Galbreath*, 1935 OK 1205, 175 Okla. 305, 52 P.2d 780, 782 ("It is our opinion that the purpose of the ninety-day provision as to heads of families was to broaden and liberalize the definition of 'current' wages or earnings. Instead of leaving that question to the court to be determined from the facts in each case, it merely provides that any wages or earnings earned within the last ninety days shall be regarded as current.").

[47] *See, e.g., Barteldes Seed Co. v. Gunn*, 1916 OK 876, 61 Okla. 95, 159 P. 502.

[48] *Id*. at 502 (interpreting § 3342(16) of the 1910 Revised Laws of Oklahoma, which read: "All current wages and earnings for personal or professional services earned within the last ninety days"

services," that is not relevant for our purposes.[49]   The *Barteldes Seed* court found that earnings

should be interpreted in an expansive way regardless of how they are acquired, as long as they are

due for personal services performed by the debtor.[50] While the court noted that "any doubt

whatever" regarding the application of the statute "should be resolved in favor of the claimant," it

also noted that "the courts cannot give to statutes of this character an application which the

Legislature did not intend should be extended to it."[51]

The debtor in *Barteldes Seed* was effectively an independent contractor instead of an

employee of the garnishee.[52]   The court found that this distinction did not deprive him of the

protection of the exemption statute, as long as the earnings were the result of his own labor, and

not generated as profit or gain from capital or the labor of others.[53]

> Under the evidence here Gunn [the debtor] performed some of the services
> for which this money was due by the construction company to him, and the same
> clearly constitutes his earnings, and, as we view the law, it is absolutely immaterial
> how the pay may be reserved to him, whether so much by the day, or week, or
> month, or so much for the job, it nevertheless constitutes his earnings for his
> personal services out of which he is entitled to his exemptions. However, for that
> part of the fund due by the Stiles Construction Company [the garnishee] to him for
> services performed by others, we are of the opinion that he is not entitled to claim
> any exemptions therefrom, as many elements may enter into the same other than
> the personal services of Gunn, and **the object of the statute, we think, is to exempt
> the earnings for personal services as contradistinguished from the income**

---

"shall be reserved to the head of every family residing in the state exempt from attachment or
execution and every other species of forced sale for the payment of debts[,]" and *id.*, § 5199, which
read: "The earnings of a debtor, who is a resident of this state, for his personal services at any time
within three months next preceding the issuing of an execution, attachment or garnishment process,
cannot be applied to the payment of his debts when it is made to appear by the debtor's affidavit
or otherwise that such earnings are necessary for the maintenance of a family supported wholly or
partly by his labor[.]").

[49] *Id*. at 502-03.

[50] *Id*. ("Clearly the object of this statute is to give to the head of a family his current wages and his
earnings in whatsoever manner acquired for his personal services earned within the time specified
within the statute.").

[51] *Id*. at 503.

[52] *Id*. at 502.

[53] *Id*. at 503.

> arising from a business involving other elements of gain; and it is clearly **evident that the contract feature of the services performed by others involved many elements of profit aside from the mere personal earnings of Gunn.**
>
> . . . .
>
> Both in *Heebner v. Chave*, 5 Barr. 117, and in *Costello v. The Coal Co.*, 9 Casey, 241, **the 'wages of laborers,' which the statute was designed to protect, were defined to be the earnings of the laborer, by his personal manual toil, and not the profits which the contractor derives from the labor of others.** The cases illustrate the **distinction between the two kinds of gains or rewards. It is the difference between the sale of your own labor, and a sale of another man's labor, at something more than you pay for it. What is received for another's labor over and above what is paid for it is called 'profit,' and such profits were held not to be within the protection of the statute.**
>
> We think this ruling was right. **The statute secures to the laborer and his family the earnings of his own hands, but this is its full extent and scope.** If it were carried farther by judicial decision, it would be hard to assign a limit to its operation. **The profits of every enterprise might be called the wages of labor,** with no great violence to language, and thus the collection of debts be abolished in many instances where ample means of payment existed. **The Legislature meant nothing so unreasonable and extravagant. They only meant that what a man earned by his personal labor should not be intercepted by his creditors, but should go to supply the wants of himself and family, leaving whatever other moneys might be due to him to be seized for his debts.**" [54]

Under the Oklahoma Wage Exemption Statutes, wages or earnings received from one's own labor, whether as an employee or an independent contractor, fall squarely within the statute.  Profit or gain generated from the ownership or operation of a business, whether as a return on capital or the labor of others, does not.

In *Clapp v. Smith*,[55] the Oklahoma Supreme Court determined that a farmer engaged in an agricultural pursuit on his own account could not take advantage of the exemption statute protecting wages or earnings from personal services.[56]  The court found that "[t]he language of the

---

[54] *Id*. (emphasis added).
[55] 1923 OK 353, 91 Okla. 84, 216 P. 120.
[56] *Id*. at 122 ("[T]he statute referred to (section 6596, [Okla.] Comp. St. 1921) declares 'that no process issued in any court to subject such *wages or earnings for personal services* to satisfy any

statute indicates very clearly the class of persons to whom it applies," that being a wage-earner.[57]

Likewise, in *Youst v. Willis*,[58] a case that pre-dates statehood, the Supreme Court of the Territory

of Oklahoma held that funds owed to a proprietor and keeper of a public hotel for boarding and

accommodation of guests were "in no sense the earnings for personal and professional services of

such proprietor or keeper," where he was "engaged in managing and conducting said hotel in the

usual and ordinary manner and course of such business[.]"[59] As a result, the court found the funds

were not exempt from garnishment under the prevailing exemption statute.

Both of these cases reinforce the principle stated in *Barteldes Seed*: for funds distributed

from an employer to fall within the protection of the Oklahoma Wage Exemption Statutes, they

must be tied directly to the labor of the debtor, either as a wage-earning employee or as a service-

providing independent contractor.  Elective and discretionary distributions taken by the owner of

a business, based on the profitability of the business but not necessarily tied to the quantity or

quality of effort provided by the debtor, do not fall with the statute's gambit.

2.    *The cash on hand and ADP Funds are distributions based on Haddock's ownership of HARG, and do not qualify for exemption under the Oklahoma Wage Exemption Statutes.*

In this case, Haddock is the sole owner and shareholder of HARG, a real estate brokerage.

The issue the Court must address is whether Haddock's income from HARG came in the form of

a corporate distribution from the profits of HARG, i.e., as a result of his stock ownership of HARG

unrelated to any personal services he provided to the corporation; or whether HARG treated him

---

judgment or obligation, shall ever include more than twenty–five per cent. of such wages, or personal earnings[.]'") (emphasis added).

[57] *Id*. ("Counsel for defendants contends that the fact that the defendant was not a wage–earner, but was engaged in an agricultural pursuit on his own account, is immaterial[.] . . . We cannot agree with that contention.").

[58] 1897 OK 47, 5 Okla. 170, 49 P. 56.

[59] *Id*. at 56-57 (interpreting § 1(16), c. 34, of the Oklahoma Statutes of 1893, which provided an exemption from process or garnishment for "[a]ll current wages and earnings for personal or professional services earned within the last ninety days.").

as an employee, such that he received "earnings from personal services" which were directly tied

to his labor exerted in the generation of revenue for HARG.  The evidence is definitive that

Haddock's relationship to HARG has always been as a business owner and not as an employee

providing labor in exchange for compensation. His routing of the distribution through a payroll

processing service and paying employment taxes thereon did nothing to change this.

From its inception, Haddock received income from HARG as a business owner, not as an

employee.[60]  Haddock's individual tax returns for 2020 and 2021 show no income from wages,

salaries, commissions, etc.  He reported no distributions or income from HARG in 2020, but

reported $66,642 in passive income, including $33,611 in distributions, from HARG in 2021.[61]

Haddock testified that he regularly paid personal expenses from the HARG Chase Account.  Such

withdrawals were reported as corporate distributions to Haddock on account of his ownership of

the stock of HARG.[62]  The distributions received by Haddock, in the form of cash and payment of

personal expenses from the HARG Chase Account, affected his basis in his stock of HARG, but

were not otherwise subject to employment taxes by either HARG or Haddock.[63]  HARG reported

paying no compensation to officers, or salaries or wages to any employee in 2020 or 2021.  It never

issued a W-2 or paid any employment taxes on the cash or non-cash distributions Haddock

---

[60]  S   Corporation   Employees,   Shareholders   and   Corporate   Officers,   I.R.S.
https://www.irs.gov/businesses/small-businesses-self-employed/s-corporation-employees-
shareholders-and-corporate-officers (Jan. 25, 2023) ("If an officer does not perform any services
or only performs minor services and is not entitled to compensation, the officer would not be
considered an employee.").

[61] *See* Ex. 5-11, Haddock's 2021 I.R.S. Form 8582, line 2; Ex. 7-3, HARG's 2021 I.R.S. Form
1120-S, Schedule K, lines 1, 16d; Ex. 7-6, Schedule K-1, line 1, 16.  Specifically excepted from
the I.R.S.'s definition of passive activity income is personal service income, i.e., "salaries, wages,
commissions, self-employment income from trade or business activities in which you materially
participated." I.R.S. 2022 Pub. 925, Passive Activity and At-Risk Rules, at 7.

[62] *See* Ex. 7-3, HARG Form 1120-S, Schedule K, line 16d.

[63] See Ex. 7-6, Schedule K-1, line 1, 16 ("Items affecting shareholder basis").

15

received.[64]   All of this belies Haddock's contention that he was ever an employee of HARG entitled to compensation in remuneration for his labor.

Likewise, Haddock's testimony undercuts his position that the distributions he received from HARG were a form of compensation for his labor.  Haddock had no employment agreement with HARG, but instead had full discretion over how much and in what form he would remove funds from HARG.  He indicated that he felt entitled to every dime generated by HARG, regardless of the quantity or quality of the effort he had exerted.[65]  He declared that he determined the amount of "compensation" due him based solely on the amount of HARG's revenue.  Such entitlement to corporate assets is associated with ownership of a business, but is the antithesis of an arms-length employment relationship, under which one would expect some contractual connection between a laborer's effort and its reward.

Following the Oklahoma case law discussed *supra*, the Court finds that Haddock is the operator of a business that does not fall within the protections of the Oklahoma Wage Exemption Statutes.  Haddock has no history of receiving compensation based on his personal services from HARG. Likewise, he has no employment contract with HARG—explicit or implicit—for the receipt of wages, a salary, or commissions from real estate transactions.  Haddock had complete discretion over whether and how to receive funds from HARG, and prior to May 2022 had always done so in the form of corporate distributions.

---

[64] *See* About Form W-2, Wage and Tax Statement, I.R.S., https://www.irs.gov/forms-pubs/about-form-w-2 (Oct. 3, 2022) ("Every employer engaged in a trade or business who pays remuneration, including noncash payments of $600 or more for the year (all amounts if any income, social security, or Medicare tax was withheld) for services performed by an employee must file a Form W-2 for each employee (even if the employee is related to the employer) from whom: Income, Social Security, or Medicare tax was withheld.").

[65] "I earned it!" was a common refrain in Haddock's testimony.

Haddock made it clear that his receipt of the ADP Funds was directly linked to how much money remained in the HARG account on the eve of bankruptcy; it bore little, if any, connection to his provision of personal services to HARG.  This Court believes the Oklahoma legislature did not intend to exempt all funds a person chooses to "draw" from their business where the individual has full discretion over what expenses to pay or not pay in order to fund the draw.  If Haddock had *any* history of paying himself reasonable compensation in exchange for personal services provided to HARG, the Court would not hesitate to find similar payments received within 90 days of the Petition Date to be protected by the Oklahoma Wage Exemption Statutes.  But here, Haddock's last-minute routing of HARG assets through ADP into the Owasso Account did nothing to transform the nature of those assets into earnings in the hands of Haddock. The ADP Funds and any cash on hand Haddock had removed from HARG in the months preceding the Petition Date were—and remain—voluntary distributions Haddock withdrew from HARG for which no exemption exists.

To the extent Haddock's testimony is truthful, that he provided significant personal services to HARG and *should have been receiving compensation* for same all along, the I.R.S. has the authority to recharacterize the distributions he received and impose additional federal employment taxes on both HARG and Haddock.[66]  Nothing in this opinion should discourage or prevent the I.R.S. from doing so.  But this Court does not have the authority or jurisdiction to

---

[66] S Corporation Employees, Shareholders and Corporate Officers, I.R.S. https://www.irs.gov/businesses/small-businesses-self-employed/s-corporation-employees-shareholders-and-corporate-officers (Jan. 25, 2023) ("Courts have consistently held S corporation officers/shareholders who provide more than minor services to their corporation and receive, or are entitled to receive, compensation are subject to federal employment taxes."); 26 U.S.C. § 7436; *Staffmore, LLC v. C.I.R.*, 106 T.C.M. (CCH) 122, *3 (2013) ("Section 7436 governs proceedings in this Court for determining employment status.").

reclassify or recharacterize the distributions.[67]  Our task is only to determine the nature of the funds as they stood on the Petition Date.

3.        Law v. Siegel *is not implicated in this case.*

In *Law v. Siegel*,[68] the United States Supreme Court admonished bankruptcy courts that federal law provides them no authority to deny an exemption on a ground not specified in the Bankruptcy Code.[69]  The Court emphasizes that it is not exercising § 105(a) to deny an exemption to which Haddock would otherwise be entitled.  Likewise, the Court does not consider whether HARG's last minute distribution of the April and May Checks through ADP is reflective of bad-faith conduct by Haddock.[70]  The Court is merely exercising its core bankruptcy jurisdiction to "allow[] or disallow[]" an exemption from property of the estate under applicable Oklahoma law.[71]  The Court finds that all funds withdrawn from HARG by Haddock were corporate distributions, which are not exempt under the Oklahoma Wage Exemption Statutes.  Filtering the funds through ADP and paying employment taxes on those funds did not transform their character as distributions.

---

[67] *Staffmore, LLC v. C.I.R.*, 106 T.C.M. 122 at *3 ("[The Tax Court] ha[s] jurisdiction to review determinations of employment status only if they arise in connection with an IRS audit and an examination.") (citing 26 U.S.C. § 7436(a)).

[68] 571 U.S. 415 (2014).

[69] *Id*. at 425.

[70] *Id*. ("[Debtor] suggests that those decisions reflect a general, equitable power in bankruptcy courts to deny exemptions based on a debtor's bad-faith conduct. For the reasons we have given, the Bankruptcy Code admits no such power.").

[71] 28 U.S.C. § 157(b)(2)(B).  *See also* § 522(*l*) ("Unless a party in interest objects, the property claimed as exempt on such list is exempt."); Fed. R. Bankr. P. 4003 ("After hearing on notice, the court shall determine the issues presented by the objections.").

## Conclusion

The Objection to Claims of Exemption filed by Scott P. Kirtley, Trustee, is sustained.

Haddock's claim of exemption in the $1,826 cash on hand and ADP Funds of $55,655.84 is denied.

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 15th day of March, 2023.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

7812v3